552 So.2d 946 (1989)
1800 ATLANTIC DEVELOPERS, Appellant,
v.
DEPARTMENT OF ENVIRONMENTAL REGULATION and City of Key West, Appellees.
No. BQ-267.
District Court of Appeal of Florida, First District.
November 9, 1989.
Rehearing Denied December 18, 1989.
*947 Douglas M. Halsey and Evan M. Kaplan of Thomson, Zeder, Bohrer, Werth & Razook, Miami, for appellant.
Douglas H. MacLaughlin and Richard Grosso, Tallahassee, for appellee Department of Environmental Regulation.
Leslie K. Dougall, Asst. City Atty., Key West, for appellee City of Key West.
PER CURIAM.
1800 Atlantic Developers appeals a final order of the Department of Environmental Regulation that denied appellant's application for a dredge and fill permit to make improvements, including sand restoration, to an eroded beach lying adjacent to a condominium project owned by appellants. Finding several errors in the administrative proceeding below, we reverse the order and remand for further proceedings on the application.

I.
The land in question is located on the Atlantic Ocean in Key West between Rest *948 Beach and Smathers Beach. A public boat ramp abuts the boundary of 1800 Atlantic's property, and a fishing pier is located at Rest Beach. Two jetties extend seaward from Smathers Beach. 1800 Atlantic plans to construct a condominium project on the upland and construct improvements in the beach area. Its application, filed April 19, 1985, seeks a dredge and fill permit for the restoration of sand to its beach, construction of a 200-foot jetty on its east property line, construction of a 400-foot fishing pier on its western property line, and construction of a 50-foot square art display platform to be located seaward of the restored beach. Both the uplands and the submerged lands involved in the condominium project and the beach improvement project are privately owned by 1800 Atlantic, the submerged lands having been conveyed by the Board of Trustees of the Internal Improvement Trust Fund to 1800 Atlantic's predecessor in title by deeds dated in 1954 and 1955.[1] 1800 Atlantic's property is about 460 feet wide at the shoreline, and the beach area to be filled extends seaward 20 feet from the mean high water line at the western end to a maximum of 100 feet from the mean high water line near the eastern end of the project. Water depths in this area are extremely shallow, and during low tides the entire fill area is exposed.
Both Smathers Beach and 1800 Atlantic's beach were built up with sand fill consisting of limestone fragments sometime prior to 1962. 1800 Atlantic's beach is eroding and the erosion is exacerbated by the two jetties at Smathers Beach and the public boat ramp, which effectively block any natural longshore beach nourishment of the shoreline from the east. Because of erosion occurring at Smathers and Rest Beaches, in February 1982 the United States Army Corps of Engineers prepared a feasibility report for beach erosion control with an accompanying environmental impact statement for Monroe County. 1800 Atlantic's property falls within the boundaries of this proposed beach erosion control project. The Corps of Engineers has stated that the proposed beach restoration project by 1800 Atlantic is consistent with the overall beach restoration project for Key West described in the feasibility report, and this has also been confirmed by the Florida Department of Natural Resources, Division of Beaches and Shores. The City is the local sponsor of the beach erosion control project described in the feasibility report and confirmed its support of the overall beach renourishment project to DER. The Governor of Florida, in 1981, expressed written support for the Corps of Engineers' beach restoration project with the recommendation that "any future beach nourishment be done in an environmentally sensitive manner."[2]
Shortly after 1800 Atlantic filed its application, DER adopted rule 17-3.041(i), Florida Administrative Code, designating the waters in this area of Key West "Outstanding Florida Waters" effective May 8, 1985. This designation was adopted pursuant to section 403.061(27)(a), Florida Statutes (1984 Supp.), and the newly enacted Warren S. Henderson Wetlands Act of 1984, ch. 84-79, Laws of Florida, which is codified at sections 403.91-403.929, Florida Statutes (1984 Supp.). Both the 1984 act and rules promulgated thereunder impose additional requirements for the issuance of dredge and fill permits in designated waters and wetlands areas. Of particular importance to the issues in this case is the requirement in section 403.918(2) that before a permit can be issued for a project in Outstanding Florida Waters the applicant must provide reasonable assurance that water quality standards will not be violated and that the *949 project will be clearly in the public interest in accordance with the seven described statutory criteria.[3] Rule 17-4.242, Florida Administrative Code, also adopted pursuant to that act, requires that an applicant for a dredge and fill permit must demonstrate that "the existing ambient water quality within Outstanding Florida Waters will not be lowered as a result of the proposed activity."
1800 Atlantic made several revisions to its application in response to concerns expressed by DER's representatives, but DER issued a notice of intent to deny the permit on September 5, 1985. As a result, 1800 Atlantic requested a 120.57(1) hearing and continued discussions with DER regarding appropriate additional changes to allow issuance of the permit. After obtaining further revisions, supplemental technical information, and agreement to numerous specific conditions from 1800 Atlantic, DER gave notice of its intent to issue the permit on March 27, 1986, and 1800 Atlantic withdrew its request for hearing. As a consequence, the Florida Keys Citizens Coalition and the City of Key West (intervenors) requested a formal administrative hearing to contest the proposed issuance of the permit. The case was assigned to a hearing officer from the Division of Administrative Hearings and a final hearing was set.
Shortly before the scheduled hearing, DER gave notice that it would not support the issuance of the permit unless 1800 Atlantic further modified its proposed project and provided "mitigation" of adverse effects that may be caused by the project.[4] As a result of the meeting with DER, 1800 Atlantic agreed to additional permit conditions, which included both a reduction in the size of the project and a mitigation plan as suggested by DER.[5] With these additional *950 conditions, DER agreed to support issuance of the permit. Despite some concerns expressed by the intervenors to proceeding on their petitions before the final language of these conditions was reduced to writing, the matter was heard on the intervenors' petitions as scheduled. The nine conditions were not reduced to writing until after the hearing, but they were described at length during the final hearing and were the subject of extensive cross-examination during the testimony.
We shall not undertake to describe all the evidence presented at the hearing. It is sufficient to say that thousands of pages of testimony and documents, much of it highly technical and scientific, was presented for consideration by the hearing officer, DER, and, ultimately, this court.

II.
The hearing officer filed a 38-page order recommending that the dredge and fill permit be denied "based on failure to provide reasonable assurances that the project is clearly in the public interest." The hearing officer made detailed findings of fact on the type of vegetation and marine life in the project area, the benefits provided by these species, and the probable effects of 1800 Atlantic's proposal on this area. The hearing officer specifically found that the proposed project would not adversely affect the public health, safety, or welfare, or significant historical and archeological resources, or endangered species or their habitats. Nor would the project degrade or cause violations of DER water quality standards for Outstanding Florida Waters. The project would not affect the flow of water, and harmful erosion or shoaling, though possible, would not be likely to result. With respect to the criteria relating to "current condition and relative value of functions being performed by areas affected by the proposed activity," the hearing officer found "there are many natural areas typical to the Florida Keys which ... are more valuable than the project site in biological productivity, as nursery and feeding grounds for fish, marine life and wildlife." However, the hearing officer found the project would adversely affect the conservation of fish and wildlife, and fishing or recreational values and marine productivity in the area, but further found that issuance of the permit would not have adverse cumulative impacts because there were no similar projects existing or under construction.
The hearing officer further found that 1800 Atlantic had not shown there was any "necessity" for the project or lack of "alternatives," and since, among other things, 1800 Atlantic had not "guaranteed" unlimited free public access to its restored property, it had not proven benefits to the "general public" and that the project "was clearly in the public interest." Concluding as a matter of law that 1800 Atlantic failed to show the proposed fill would be "clearly in the public interest," he recommended that 1800 Atlantic's permit be denied, stating:
One searches in vain for any significant public benefit from this project. New beach recreational opportunities would inure to the owners, guests, and tenants of the upland condominium. But no showing has been made that the general public would share in these opportunities. As to the claimed benefit of elimination of a shoreline of discontinuity, the project would create a new one (the groin structure) and, potentially, more discontinuity to the west.
No need for the project has been shown. The shoreline is stable and in equilibrium, protected by a natural armor 25 years in the making. Upland structures have not been shown to be in danger of being undermined. To the extent the applicant seeks to provide an added degree of protection from the sea (by widening the existing upland buffer zone); it has not shown that there are no reasonable alternative means to accomplish *951 this result; means not requiring destruction of marine and wildlife habitat.
(R. 426A).
The recommended order shows that the hearing officer did not consider the additional permit conditions, including the mitigation, to which 1800 Atlantic had agreed because, in his view, these conditions lacked "detailed specifications" in that such conditions were "vague" and "ill-defined" and, to the extent 1800 Atlantic had agreed to submit additional drawings to DER following permit issuance, these conditions "placed beyond the scrutiny" of others "critical features" of the project. (R. 415A-416).

III.
1800 Atlantic filed 34 exceptions to the recommended order, most of which were denied in the Department's final order entered by Victoria J. Tschinkel, the Secretary of DER. The final order approved and adopted most of the findings of fact and conclusions of law in the recommended order and denied the permit. The following stated rulings and reasons therefor are significant to the issues on this appeal.
In discussing the hearing officer's refusal to consider the matters in mitigation and conditions agreed to by 1800 Atlantic for lack of specificity, the Secretary stated she was bound by the finding of fact that the additional permit conditions were "vague" and "ill-defined," and concluded that unless 1800 Atlantic had provided "the requisite specificity to satisfy the hearing officer," necessarily 1800 Atlantic had not provided the reasonable assurance required by section 403.918.[6]
1800 Atlantic's exception 6 challenged the hearing officer's finding of the amount of halodule grass present in the fill area. The Secretary stated that this finding was based on the testimony of "one witness who viewed the fill site from the shore for approximately one hour" and totally disregarded "the testimony of three expert witnesses, one of whom made five 52 meter straight line transects at the project site... ." (R. 439). The Secretary concluded, rather ambiguously, that "this finding of fact should not be given much weight." (R. 439). Having so stated, the order continues:
Even minimizing such testimony, however, there is no question that the record shows that the proposed fill site is a productive marine habitat. The dispute appears to be over how productive that marine habitat may be. In this regard, since the proposed fill site is in Outstanding Florida Waters, the burden is on the permit applicant to show that any quantifiable diminution in the quality of this marine habitat must be offset by a showing that the filling would result in a net environmental benefit to the area, that mitigation efforts supplementing the filling would create a net environmental benefit, or that application of the seven statutory considerations would otherwise enable applicant to comply with the "clearly in the public interest" Outstanding Florida Waters test.
(R. 439). We must note at this point that there is no finding of fact in the hearing officer's recommended order that quantifies "how productive the marine habitat may be" in this case, and no record support for the Secretary's suggestion that there would be some quantifiable diminution in the quality of the marine habitat attributable to this project.[7]
*952 Exception 23 filed by 1800 Atlantic challenged the hearing officer's finding that the project will adversely affect the conservation of fish and wildlife, fishing or recreational values, and marine productivity in the vicinity. This exception emphasized that comparatively low levels of diversity exist in the shallow water habitat of the fill area and that to say that the fill area supports a diverse community is misleading. The final order rejected this exception based upon the hearing officer's general statements, without any quantification whatsoever, of adverse effects upon these matters, concluding that 1800 Atlantic does not consider these effects de minimis and that these findings go to the heart of the public interest test under section 403.918(2).[8]
In the final order the Secretary agreed with 1800 Atlantic's exception that 1800 Atlantic, as the applicant, need not show any necessity for the project, and observed that "necessity is not a condition precedent to obtaining a permit." (R. 443). However, the order concludes that such fact may be relevant under the public interest test. The Secretary also agreed with the exception to the hearing officer's finding that 1800 Atlantic failed to demonstrate *953 that its beach project will provide recreational opportunities to the general public, and stated that 1800 Atlantic
is correct in its analysis of Grove Isle, Limited v. Department of Environmental Regulation, 454 So.2d 571 (Fla. 1st DCA 1984), and subsequent legislative history surrounding the enactment of the Warren Henderson Wetlands Protection Act in 1984, to the extent they establish that an applicant's failure to guarantee public access is not a valid reason by itself for rejecting a permit application in an Outstanding Florida Water. Assuming that an applicant passes the balancing test for the seven criteria set forth in Section 403.918(2)(a), Florida Statutes, it is irrelevant whether or not the proposed site will make provision for public access. I must accept this exception to that extent, therefore. This does not mean, however, that 1800 Atlantic is now entitled to its permit. Other considerations previously discussed  particularly, the problems with diminished marine and wildlife habitat, the inadequately specified nature of the changes to the project application, and the ill-defined nature of the mitigation proposals  are sufficient by themselves to support denial of the permit notwithstanding the hearing officer's misapprehension of the public interest test. Let me add that I am not excluding public access altogether from consideration in determining whether a project is clearly in the public interest. If there are some environmental problems associated with the project, the fact of creation of public access to a public resource where one does not now exist may have some bearing on whether the project is clearly in the public interest. This does not mean, however, that failure of an applicant to provide public access is a basis upon which a permit application can be denied. To the extent the hearing officer infers this to be the case, such inference is rejected.
(R. 443A-444).
The final order then summarized the Secretary's views on the meaning of the Warren Henderson Wetlands Protection Act with particular emphasis on the public interest test under section 403.918(2):
In evaluating the clearly in the public interest test, the applicant is correct to the extent that it does not necessarily have to demonstrate that the proposed project would either enhance the environment, have no alternatives that are less damaging environmentally, be necessary, or show a public as opposed to private benefit. These factors may have to be considered, however, once the project proposed has been shown to have the negative environmental impacts found by the hearing officer, or might negatively impact other section 403.918(2)(a), Florida Statutes, criteria... . In addition to their use in a subsection (2)(b) mitigation analysis, factors such as environmental enhancement, alternatives, necessity and public versus private interest must be considered in the balancing test contained in subsection (2)(a) to determine whether the project would be clearly in the public interest to overcome a finding of negative environmental impacts. Such factors could include, for example, protection of public or private property against harmful erosion; the need for access to obtain recreational benefits; and other considerations of the public health, safety or welfare. It is clearly appropriate, in resolving the subsection (2)(a) balancing test, to address such considerations as less environmentally damaging alternatives, the necessity that a particular project be the means for accomplishing a public welfare goal that is environmentally harmful when other less harmful means exist, or whether an environmentally damaging project will benefit the public at large as opposed to a select few. In this case the applicant had to show either that no environmental harm as delineated in the statute would come from the project, that other considerations clearly in the public interest existed that outweighed the harm, or that the applicant through mitigation was able to overcome any harm. The hearing officer found that the applicant failed to establish, with sufficient specificity and clarity, that any of these conditions *954 would occur. Those findings are based upon competent, substantial evidence, and so I am not at liberty to overrule them.
(R. 446A-447A). The Secretary adopted the hearing officer's findings of fact and conclusions of law as modified pursuant to her rulings on the exceptions, and denied the application with leave for 1800 Atlantic to file a new application to construct a beach at this site.[9]

IV.
Initially, 1800 Atlantic argues that the final order must be reversed pursuant to section 120.68(8), Florida Statutes (1987), because material errors in procedure impaired the fairness of the proceeding.

A.
The statutory scheme established by the Warren S. Henderson Wetlands Protection Act of 1984, sections 403.91-403.929, Florida Statutes (1985), is intended to regulate dredge and fill activities in certain waters and wetlands of the State of Florida for the purpose of protecting and preserving the natural balance of the environment as much as possible. The statutory purpose is to be accomplished in two ways. First, the statute requires conformance to water quality standards for wetlands to be established by rules duly adopted by DER. § 403.918(1), Fla. Stat. (1985). Second, the statute requires an applicant to demonstrate that "the project is not contrary to the public interest" or, if the project "significantly degrades or is within an Outstanding Florida Water, ... the applicant must provide reasonable assurance that the project will be clearly in the public interest." § 403.918(2), Fla. Stat. (1985). Setting the criteria for determining what constitutes the "public interest" is not delegated to DER's exercise of its rule-making power, unlike the delegation of setting water quality standards. Instead, the statute sets forth seven criteria to be considered and balanced by DER in determining "whether a project is not contrary to the public interest, or is clearly in the public interest." See statute quoted at note 3, supra. While the obvious statutory purpose is to regulate dredging and filling activity to prevent or limit harm to the natural environment in the respects described in the statute, there is no manifest statutory intent to prohibit the owner from conducting dredging and filling activity altogether. This is made perfectly clear by the statutory provisions requiring that: (1) "if the applicant is unable to otherwise meet the criteria set forth in this subsection, the department, in deciding to grant or dent a permit, shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project" [§ 403.918(2)(b)]; and (2) in the event the department issues a notice of intent to deny or denies a permit pursuant to the act, "such notice or denial shall contain an explanation, in general terms, of what changes, if any, in the permit application are necessary in order for the department to approve the proposed project" (§ 403.92). Absolute prohibition of dredge and filling activity, therefore, should be the rare exception in cases of extreme damage to the environment that cannot be avoided or mitigated under any circumstances. It must be remembered that this act was not intended to serve as a means for the state to acquire private land for public purposes, or to compel the owner of private land to make it available for the public use and benefit, without the state's having to pay just compensation to the *955 owners.[10]
DER made considerable effort to comply with these statutory requirements prior to the hearing in this case. It specified the areas of its disagreement with 1800 Atlantic's application and worked out sufficient conditions and changes to make the application acceptable to the Department. DER then departed from the statutory scheme, however, when, because it changed positions at the hearing and in the final order, it determined to deny 1800 Atlantic's application with leave to file another application rather than specifying what changes are needed to make the pending project application acceptable. This attempt to partially invoke the doctrine of res judicata was contrary to the statutory scheme. As a consequence of DER's failure to comply with the explicit requirements of section 403.92, reversal of the appealed order and remand for further proceedings is required.

B.
Furthermore, despite DER's extensive efforts to conform to the requirements of section 403.918(2)(b)[11] by working out agreement on matters in mitigation set forth in the additional conditions acceptable to 1800 Atlantic that DER indicated were sufficient to authorize issuance of the permit, DER accepted the hearing officer's recommendation to deny the permit because he concluded that the additional conditions did not contain detailed specifications but were vague and ill defined. This ruling by DER was based on the recited belief that these conclusions of the hearing officer were "findings of fact" and binding on the Department. In so ruling, DER erred.
Section 403.918(2)(b) requires that DER, not the hearing officer, consider and determine what measures to mitigate adverse effects that may be caused by the project will be legally sufficient under the statute. This task cannot be delegated to the hearing officer. It is the responsibility of DER, not the hearing officer, to establish mitigative measures acceptable to it under the statute. DER, not the hearing officer, has the statutory responsibility to define mitigative measures that would be sufficient to offset the perceived adverse effects of the dredging and filling contemplated by the project in accord with the statutory criteria for determining public interest. As the hearing officer's function was only that of a fact finder, it was the hearing officer's function to make findings of fact regarding disputed factual issues underlying the conditions set by DER and the implementation of and compliance with the mitigative conditions set by DER. The hearing officer was not vested with power to review DER's discretion in setting acceptable mitigative conditions in the sense of passing on their sufficiency to meet the statutory criteria. The Secretary's treatment of the hearing officer's findings regarding the sufficiency of DER's conditions as binding on DER would amount to an unlawful abdication of the agency's statutory responsibility and power. The prescription in section 120.57(1)(b)9 that a hearing officer's findings of fact are binding on the agency when supported by competent substantial evidence does not encompass findings on the sufficiency of the mitigative conditions agreed to by DER and 1800 Atlantic, as such findings are properly characterized as conclusions of law.
*956 As a result of DER's acceptance of the hearing officer's rejection of the agreed-to conditions as binding and the denial of the application without setting forth what changes and mitigative conditions may be necessary to warrant approval of the permit, DER has clearly violated section 403.918(2)(b). If DER agreed that the additional conditions were so lacking in detailed specifications that it could not issue the permit, the proper course of action under the statutory procedure was for DER to communicate these deficiencies to 1800 Atlantic and allow the applicant to submit more detailed specifications. In short, the deficiencies in these conditions found by the hearing officer were not a legal ground for outright denial of the permit with the accompanying finality set forth in DER's final order, especially in view of the Secretary's explicated intent to invoke the doctrine of res judicata by issuance of this order to preclude the relitigation of certain facts. See Thomson v. Department of Environmental Regulation, 511 So.2d 989 (Fla. 1987).
We hold that these procedural deficiencies impaired the fairness of the proceeding and resulted in the denial of the permit upon an illegal basis without first affording 1800 Atlantic a further opportunity to modify its application for permit to meet DER's objections, as required by the statute. Accordingly, the order is reversed and the cause remanded for further negotiations and proceedings as may be necessary to comply with the statute. See Santa Fe Pass, Inc. v. State Department of Environmental Regulation, 520 So.2d 618 (Fla. 1st DCA 1988).

C.
1800 Atlantic also contends that the hearing officer erred in permitting Curtis Kruer, an employee of the United States Army Corps of Engineers and a member of the Florida Keys Citizens Coalition, to testify on behalf of the Coalition as an expert witness in the field of marine biology and "coastal processes." 1800 Atlantic objected to permitting this witness to testify as an expert because he had not first obtained prior written authorization from the Corps of Engineers pursuant to 32 C.F.R. 97.6(e) (1986). DER contends that the hearing officer's ruling was correct because the witness was subpoenaed under state law and had to attend the hearing, § 120.58(1)(b), Fla. Stat., and the hearing officer's "role did not encompass enforcing federal regulations." (DER's Answer Brief, p. 16.) It is elementary that the supremacy clause of the federal Constitution makes federal statutes and regulations controlling over state law on the same issue. The fact that this witness was subpoenaed pursuant to state law did not excuse him, the parties, or the state tribunal from complying with applicable federal law limiting his authority to testify about certain matters. The hearing officer had no authority to permit the witness to testify in violation of the cited regulation.
We conclude on this record, however, that appellant has not demonstrated that the testimony given by this witness involved official information of the Corps of Engineers that fell within the proscription of the regulation. Accordingly, we do not find any error in respect to the hearing officer's receiving this witness's testimony. We note parenthetically that the Secretary gave little credence to this testimony in the final order.

V.
1800 Atlantic next complains that DER has erroneously interpreted section 403.918(2) so as to authorize the Department to consider factors not contained in the statute in passing on the sufficiency of an application for permit by requiring that the project covered by the application produce a net benefit to the public to meet the public interest test.
It is perfectly clear to us that the hearing officer was under the erroneous impression that the Warren Henderson Wetlands Act required an applicant to demonstrate a "significant public benefit" as a prerequisite to obtaining a permit in the sense that the "public would share in the opportunities" to be afforded to owners, guests and tenants of the privately developed *957 condominiums on 1800 Atlantic's land. The hearing officer similarly concluded that "no need for the project has been shown." As previously set forth, the Secretary did not fully agree with these views of the hearing officer, stating that necessity is not a condition precedent to obtaining a permit and the owner applicant need not provide recreational opportunities to the general public. But the Secretary concluded that such facts are relevant under the public interest test, reciting in part:
[A]lthough beach creation or renourishment may have public interest considerations associated with the protection of public or private property, an applicant must first demonstrate, as was not done here, the need for such protection in the first place. (R. 443).
Necessity may come into play in the consideration of an applicant's entitlement to a dredge and fill permit, particularly in an outstanding Florida Water. (R. 443). I am not excluding public access altogether from consideration in determining whether a project is clearly in the public interest. (R. 444).
It is clearly appropriate, in resolving the subsection (2)(a) balancing test, to address such considerations as ... whether an environmentally damaging project will benefit the public at large as opposed to a select few. (R. 447).
We observe that the statute does not specify "need" for the project as a relevant consideration in defining criteria for determining public interest. 1800 Atlantic's project was entirely on private property intended for the benefit of private users, and it was not obligated to show a need or necessity for the dredging and filling in the sense of benefiting the public or the environment. It was only required to show that the dredging and filling required by the project would be carried out in a manner that would not materially degrade water quality and in a manner that was clearly in the public interest. In short, the dredging and filling statute does not regulate land use, such as a zoning regulation, but only the method of construction. In cases where the dredging and filling would substantially degrade water quality or materially harm the natural environment, the fact that a substantial public need or benefit would be met by approving the project may be taken into consideration in balancing adverse environmental effects. This is a purpose of the public interest test and the seven statutory criteria. While there may be projects that can never be permitted at all because the proposed construction cannot pass muster under the statutory requirements for dredging and filling under any circumstances, nothing in this record suggests that 1800 Atlantic's project falls into that category. This project is consistent with the Key West beach restoration project and will restore the owner's previously filled beach. We hold, therefore, that the applicant 1800 Atlantic need not show any particular need or net public benefit as a condition of obtaining the permit.
Nor does the statute require that 1800 Atlantic prove the absence of negative impacts from the project and demonstrate the creation of a net environmental or societal benefit to meet the public interest test. Suggestions in the final order that this showing is necessary simply because the project is in Outstanding Florida Water go beyond the statutory provisions and have no basis in the law.

VI.
Finally, 1800 Atlantic contends that section 403.918(2)(a) and the seven public interest criteria set forth therein are too vague and undefined and therefore are unconstitutional. In view of our disposition of the issues discussed above, we find it unnecessary to reach this constitutional issue.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
SHIVERS, C.J., ZEHMER, J., and PEARSON, TILLMAN (Ret'd), Associate Judge, concur.
NOTES
[1] The deeds conveyed submerged lands extending approximately 400 feet seaward of the mean high water line. Thus, all of the fill area is privately owned and does not involve public property.
[2] The hearing officer's recommended order found these facts to be true, but explained that the City's support "is not necessarily inconsistent with its opposition to a relatively small project undertaken primarily for the private benefit of the owners, guests, and tenants of an adjacent condominium." (R. 422). The Department's final order agrees with 1800 Atlantic's exception that this statement by the hearing officer is irrelevant and of no probative value in the case. (R. 441A).
[3] Section 403.918 states in part:

(1) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that water quality standards will not be violated. The department, by rule, shall establish water quality criteria for wetlands within its jurisdiction, which criteria give appropriate recognition to the water quality of such wetlands in their natural state.
(2) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest. However, for a project which significantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the project will be clearly in the public interest.
(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:
1. Whether the project will adversely affect the public health, safety, or welfare of the property of others;
2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;
3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;
4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;
5. Whether the project will be of a temporary or permanent nature;
6. Whether the project will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and
7. The current condition and relative value of functions being performed by areas affected by the proposed activity.
[4] Section 403.918(2)(b), Fla. Stat. (1985), states in part:

If the applicant is unable to otherwise meet the criteria set forth in this subsection, the department in deciding to grant or deny a permit shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project. If the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards.
[5] The additional conditions generally called for:

1. Excavation of an upland area to subtidal/intertidal elevations similar to the area proposed to be filled (the "Fill Area");
2. Reduction of the size of the Fill Area;
3. Construction of a small terminal structure at the western end of the Fill Area with rubble from the Fill Area;
4. Relocation of the algae covered rubble within the Fill Area to other locations;
5. Relocation of the patch of sea grass at the eastern end of the Fill Area to a site outside the Fill Area;
6. Posting of a bond if conditions 1, 4 and 5 are not completed prior to filling;
7. Staking of the seaward limits of Fill Area prior to filling;
8. Deposition of the sand having low tides;
9. Easement to ensure area described in condition remains subtidal/intertidal.
[6] The final order indicates that although the additional conditions agreed to by 1800 Atlantic at the request of DER had been reduced to writing and filed as DER Exhibit 7 after the hearing, "the acceptance of such Exhibit, however, need not bind the hearing officer to the probative value of its contents. Once again, the burden was upon 1800 Atlantic to prove that the new project was adequately described to provide reasonable assurances. Even Exhibit 7, however, deferred to a later date Department approvals regarding specific delineations of the changes. While as a matter of policy I recognize that some projects may require `field engineering' and post-issuance submissions of engineering or similarly detailed drawings, a permit applicant still must demonstrate that the reasonable assurances exist before commencement of the project." (R. 437-437A).
[7] The recommended order recites:

35. The actual placement of the fill will have no impact on mobile organisms able to retreat to other waters. Benthic and other organisms on the site which are relatively immobile would be destroyed by the fill. The number killed would be a relatively small fraction of the total of such organisms along the Key West shoreline, and their loss  alone  would not affect the marine environment to an extent which is quantifiable.
(R. 419A). No other finding of fact undertakes to quantify, with reference to any identified standards set by statute or rule, the amount of loss or adverse impact of fish and wildlife by reason of the fill project; the only reference to such standards appears in finding of fact 32:
Benthic sampling at the site took place as recently as June 1986. Three petite ponar samples were taken in seagrass beds 150-160 feet seaward of the shoreline; three were taken in the rubble zone just seaward of the toe of the proposed fill; and two were taken in seagrass beds off nearby Smathers Beach. As measured by the Shannon Weaver Species Diversity Index, the level of species diversity in the rock rubble just seaward of the toe of fill was 2.19; in the seagrass beds farther offshore, 4.71; and in the seagrass beds off Smathers Beach, 4.76. A diversity of 4 is in the upper range of food habitat. Although diverse species of benthic organisms are found on the site, the level of diversity is substantially less than the high levels found in the thicker seagrass immediately seaward of the project site. (R. 419)
There follows in finding of fact 33 a general discussion of the fact that some migratory birds, wading birds, and shore birds might be forced to use another area because "the proposed fill would adversely impact this valuable feeding ground for birds" and "increased residential use of the beach would drive off bird life." (R. 419A). Finding 34 then states:
There are many natural areas typical to the Florida Keys which, as DER and 1800 Atlantic contend, are more valuable than the project site in biological productivity, and as nursery and feeding grounds for fish, marine life, and wildlife. Nevertheless, this fact does not negate the substantial benefits which the site now provides to juvenile fish, crustaceans, benthic marine organisms, and bird life.
(R. 419A).
Such general statements of effect without any reference to standards set by statute or rule provide no meaningful way to measure whether the adverse effect is de minimis or substantial, and thus frustrates meaningful appellate review of the final order's compliance with applicable legislation.
[8] The order states in part:

Whatever the specifics may be as to diversity index numbers, the extent of seagrasses, and so forth, evidence clearly exists in the record, as found by the hearing officer, to support the finding as he stated it:
The site, which would be permanently covered with beach sand, now provides viable intertidal marine habitat and a feeding ground for migratory, shore and wading birds. It supports numerous species of juvenile fish and crustaceans, a diverse benthic and algae community, and patches of seagrass which benefit water quality and enhance the ecology of the marine environment. This shallow water habitat, gently sloping to the sea from an extended unfortified shore line, is a diminishing resource in Key West. The existence of other submerged areas which are more biologically productive and support an even greater diversity of marine life do not diminish the positive value of the undisturbed project site to the marine environment.
This finding goes to the crux of the "clearly in the public interest" test. While the various parties to this action may argue over degree of diversity, not even the permit applicant suggests that the proposed project site is sterile or that filling will have a de minimis effect on habitat in the project area. The record clearly supports the hearing officer's finding that the project will adversely affect the conservation of fish, wildlife and marine productivity both within the project area and in the vicinity of it.
(R. 442-442A).
[9] The Secretary was concerned about the res judicata effect of the order in view of DER's vacillation on the changes necessary to allow the permit to issue. To avoid unduly harsh results that could flow from the application of the doctrine of res judicata, citing this court's decision in Thomson v. Department of Environmental Regulation, 493 So.2d 1032 (Fla. 1st DCA 1986), the order explicitly provided that it "does not foreclose a further application by 1800 Atlantic to construct a beach at the proposed site"; however, "specific facts determined in this proceeding will be binding, on any subsequent application, except as to the extent aspects of the permit application were found to be insufficiently defined, to the extent and for the reasons set forth in this Order." (R. 447A-448). The cited decision was quashed by the supreme court in Thomson v. Department of Environmental Regulation, 511 So.2d 989 (Fla. 1987).
[10] The preamble to the act in chapter 84-79, Laws of Florida, states in part:

WHEREAS, it is the policy of this state to establish reasonable regulatory programs which provide for the preservation and protection of Florida's remaining wetlands to the greatest extent practicable, consistent with private property rights and the balancing of other state vital interests, and
WHEREAS, it is the policy of this state to consider the extent to which particular disturbances of wetlands are related to uses or projects which must be located within or in close proximity to the wetland and aquatic environment in order to perform their basic functions, and the extent to which particular disturbances of wetlands benefit essential economic development, ...
[Emphasis added.]
[11] We give the words "shall consider" in that subsection a mandatory meaning rather than a permissive discretionary meaning.