COWART, Judge.
This case is an action by buyers of land against the sellers. The buyers’ claims for money damages are based on allegations that (1) the sellers “fraudulently” failed to disclose to the buyers that part of the land constituted “wetlands” subject to the regulatory jurisdiction of the State Department of Environmental Regulation (DER) and that fill dirt had been “illegally” placed on the wetlands without proper permit from DER; (2) the sellers “negligently” failed to disclose to the buyers the existence of fill dirt allegedly “illegally” placed on such “wetlands” by the sellers; and (3) the allegedly illegal fill constituted a breach of a provision in the sales agreement between the parties.
In 1980 Haas owned a parcel of land 200 feet, north and south, and about 190 feet, east and west, bounded on the east by John Anderson Drive and on the west by the waters of the Halifax River. Planning to build a house, Haas contacted DER and based on an examination of vegetation, the DER representative staked or flagged a very curved northerly-southerly line across the lot delineating an area waterward (west) of which DER claimed wetlands jurisdiction. This 1980 Haas house permit-DER line was not documented or permanently monumented on the ground and is shown only on a site diagram prepared by Haas’ engineer, Zev Cohen, and attached to a 1980 DER permit for Haas to build a stilt house partly over the “wetlands” portion of the lot. The planned and permitted Haas stilt house was never built.
By Chapter 84-79, Laws of Florida, effective October 1, 1984, the legislature enacted the “Warren S. Henderson Wetlands Protection Act of 1984” (§§ '403.91-403.929, Fla.Stat.).
On October 2, 1984, Haas sold the south 100 feet of his parcel to Field and Bruce. In June, 1985, Field and Bruce had their lot cleared of some underbrush and vegetation and on December 11 and 12, 1985, caused fill dirt to be placed on some portion of their lot.
Pursuant to a real estate contract dated June 3, 1986, Field and Bruce on August 5, 1986, conveyed their lot to the Perrys.
The Perrys did not determine if DER claimed wetlands jurisdiction over their lot and did not obtain a DER permit (as Haas had previously done) before proceeding to contract with a construction contractor to build a slab house to be located on the lot waterward (west) of the 1980 Haas house permit-DER line. The Perrys’ contractor brought more fill dirt and caused it to be spread upon the Perrys’ lot. A neighbor called the DER and a DER representative inspected the property on October 9, 1986. DER asserted wetlands jurisdiction, and proposed a “settlement” all based on the 1980 Haas house permit-DER line. The Perrys rejected the DER’s proposed settlement and continued with the construction of their home. The Perrys also retained legal counsel and an environmental specialist, Steve Beeman, who in January of 1987 made a dominant vegetation and hydric soils analysis[1] and a sketch dated February 6, 1987, proposing a DER jurisdictional line. On February 11, 1987, the DER ac *506 cepted the Beeman wetlands line as the proper DER wetlands jurisdictional line. Thereafter, the Perrys and DER consented to an order dated May 21, 1987, recognizing, and based on, the Beeman line and the Perrys agreed to pay a $1,000 fine to DER. The 1987 Beeman-Perry-DER wetlands jurisdictional line is entirely west, and wa-terward, of both the 1980 Haas house permit-DER wetlands jurisdictional line and of the Perrys’ house as constructed.
The Perrys filed this action against Field and Bruce claiming fraudulent misrepresentation, negligent misrepresentation, and breach of the real estate contract and seeking compensatory and punitive damages. The essence of the complaint is allegations that (1) while Field and Bruce owned the property, they placed fill dirt on it waterward of the 1980 Haas house permit-DER wetlands jurisdictional line and (2) that Field and Bruce did not tell the Perrys about that fill when the Perrys bought[2] and (3) that the fill constituted a breach of a provision of the real estate contract to the effect that the buyers would take the property subject to all restrictions imposed by governmental authority “provided that there exists at closing no violation.”[3]
The trial consumed four days. The transcript is nine volumes consisting of 1,528 pages. The case was tried substantially on the issues framed by the pleadings. All through the trial, Field and Bruce objected to the Perrys’ introduction of evidence as to the 1980 Haas house permit-DER line on the ground that it was inapplicable to the case and a nullity and that the only legal and relevant DER jurisdictional wetlands line was the 1987 Beeman-Perry-DER line. The trial court overruled those objections but after all the evidence was presented, the trial court came to the conclusion that the 1980 Haas house permit-DER line was inapplicable to the issues in the case and, accordingly, specifically instructed the jury that for the purposes of the trial, the DER jurisdictional line was the 1987 Beeman-Perry-DER line. The trial court, however, did not expressly instruct the jury that the 1980 Haas house permit-DER line was inapplicable to the issues in the case.
*507 As compensatory damages, the Perrys claimed various costs incurred as a result of delay in the construction of their house; the $1,000 DER fine; $3,500 paid to Bee-man; $1,600 paid to an attorney to negotiate the Perry-DER settlement and $7,900 for reduction in value of the land caused by the DER jurisdictional line established by the Perry-DER consent order. During closing argument, the Perrys’ attorney informed the jury that any punitive damages awarded would be contributed to charity. The jury found that the sellers failed to disclose facts materially affecting the value of the land and breached the sales contract and awarded the buyers compensatory damages of $21,630 and punitive damages of $25,000. The trial court set aside the $25,000 punitive damages award but awarded the buyers attorney’s fees of $21,-000 under a provision of the contract and $3,160 as costs. The sellers appeal.
The assertion of both federal and state agency power to prohibit a landowner from placing fill dirt on privately-owned lands originated from the historic sovereign authority over publicly owned “navigable waters.” Although the term “navigable waters” had been broadly defined by the courts, both sovereign entities extended regulatory authority landward from the mean high water mark of navigable waters. This was accomplished first by legislation controlling pollution of “waters of the United States”[4] and “waters of the State”,[5] and then by expanding the definition of waters to include what is euphemistically called “wetlands.” By section 403.-911(7), Florida Statutes, wetlands are defined as being the areas within the jurisdiction of the State Department of Environmental Regulation as provided in section 403.817, Florida Statutes, wherein the legislature delegated to DER the authority to promulgate rules establishing a method to determine the “natural” landward extent of the levels of “the waters of the state.” The administrative rules define “waters” as being land (damp or not so damp) upon which grows certain types of plants[6] or which is composed of certain types of soils. After this effort successfully extended pollution control from “waters” to land, both the federal[7] and state[8] governments enacted laws more or less openly prohibiting the dredging and filling of such newly defined “waters” or “wetlands” without a permit from the sovereign, based not on pollution control but on environmental protection.[9]
Prior to October 1, 1984,[10] DER did not have statutory authority to regulate the placement on private lands of fill dirt, as such, and claimed its regulatory jurisdiction over wetlands by virtue of three statutes: (1) section 253.123, Florida Statutes, which prohibits the extension of existing lands bordering on or being in the “navigable waters” of the State without compliance with statutes restricting bulkhead *508 lines waterward of the line of mean, or ordinary, high water; (2) section 403.087, Florida Statutes, which prohibits the construction, maintenance of any structure, equipment, facility, or operation which would reasonably be expected to be a source of pollution of “waters of the state” as defined in section 403.031(3), Florida Statutes, (1979), and (3) section 403.161, Florida Statutes, which prohibits pollution harmful or injurious. to animal, plant or aquatic life or property. The authority over wetlands jurisdiction that DER asserted in 1986 after the Perrys' purchase was under section 403.161, Florida Statutes.
Pursuant to the authority in sections 403.061(7) and 403.817(2), Florida Statutes, the Department of Environmental Regulation adopted administrative rules and regulations to establish a method of demarcating the “landward extent of waters of the State” (as defined in section 403.031, Florida Statutes) for regulatory purposes by reference to species of plants or soils.
The original DER “vegetative index” was adopted June 10, 1975 and was set forth in Florida Administrative Rule (FAR) 17-4.022(8). This original list was in effect at the time of the determination of the 1980 Haas house permit-DER line.[11] Upon enactment of the Wetlands Protection Act in 1984, FAR 17-4.022 was revised to provide an expanded list of vegetative species for purposes of delineating the DER wetlands jurisdictional line relating both to DER’s old pollution based regulatory authority (sections 403.087 and 403.161, Fla.Stat.), and also as to its new dredge and fill authority under the Wetlands Protection Act. The amended and expanded rule, now FAR 17-3.022 {see also section 403.817(1), Fla.Stat.), was the rule in effect in 1986 when the Perrys bought from Field and Bruce and in 1987 when the 1987 Beeman-Perry DER wetlands jurisdictional line was established.
FAR 17-3.022(8) and FAR 17-312.120(2) set forth a procedure for “grandfathering” DER jurisdictional lines determined before October 1, 1984, by use of the more limited “old list” vegetative indices. The Perrys’ complaint does not allege, and there is no evidence, that any attempt was made to comply with the grandfathering procedure in FAR 17-3.022(8) and FAR 17-312.120(2). For this reason, among others, the 1980 Haas house permit-DER jurisdictional line was invalid and of no efficacy in 1986 when the Perrys bought from Field and Bruce[12] and it was error for evidence of that line to be presented to the jury in this case.
Furthermore, the Perrys’ complaint does not allege, and there is no evidence, (1) that the fill dirt placed on the property in question by Field and Bruce in December, 1985, constituted a “structure” which could reasonably be expected to be a source of pollution invoking DER regulatory authority under section 403.087, Florida Statutes, or (2) that such fill dirt constituted a pollutant harmful or injurious to animal, plant or aquatic life or property so as to involve DER regulatory authority under section 403.161, Florida Statutes. Obviously this case does not involve a filling or bulkheading of navigable waters and therefore DER’s regulatory authority under section 253.123, Florida Statutes, is not involved.
There are other cogent reasons why the 1980 Haas house permit-DER wetlands jurisdictional line determination was of no consequence in 1986 when Field and Bruce sold to the Perrys. Unlike surveyed land lines which are, and are intended to be, definite, permanently fixed, and duly monu-mented and documented, a particular wetlands determination by DER under FAR 17-3.022, (or its predecessor rule) based on dominant plant species, is essentially good *509 only at the particular time made and for the particular matter or occasion (permit application or violation) for which the determination was made. The limited temporal nature of a wetlands line determination is recognized in the statutes and administrative rules. Section 403.914(l)(b), Florida Statutes, and FAR 17-312.040(6)(b) provide that even formal jurisdictional declaratory statements (FAR 17-312.040) are binding for 24 months[13] but only if physical conditions on the site do not change to alter jurisdiction.[14]
The three counts in the Perrys’ complaint and the evidence at trial are predicated on the allegation that the fill dirt placed on this lot in December, 1985 by the sellers, Field and Bruce, was “illegal” because some of it was allegedly placed waterward of the wetlands jurisdictional line demarcated by DER in 1980 in connection with the Haas house permit. To establish the applicability of the 1980 jurisdictional line at trial the Perrys relied on the testimony of DER representative John McDowell, who testified that in 1986, in pursuing the complaint as to the Perrys’ lot, DER relied on the 1980 Haas house permit-DER jurisdictional line as being the “then existing” jurisdictional line. The Perrys’ attorney argued to the trial court at the charge conference that McDowell testified that the DER jurisdictional line established in 1980 was effectual and did not change until the
DER changed it in 1987. The trial court was greatly concerned about the efficacy of the 1980 jurisdictional line as to the issues in the case and as to how the 1987 Beeman-Perry-DER jurisdictional line could be applicable and binding on Field and Bruce in connection with the 1985 filling and the 1986 sale to the Perrys. The trial court was correct in its ultimate conclusion that the 1980 jurisdictional line was an improper basis for any determination that the fill dirt placed by the sellers in December, 1985 was “illegal.” When the trial court concluded that, as a matter of law, the 1980 determination of wetlands jurisdiction was not valid or applicable at the time of the 1985 filling, it necessarily follows that the 1985 filling could not be found to have been “illegal” based on a waterward encroachment over the invalid 1980 DER jurisdictional line and, that one fact being an indispensable predicate of each of the counts in the Perrys’ complaint, the trial court should have directed a verdict in favor of the sellers because, under the issues as pled and tried in this case, the filling in 1985 was not made “illegal” by virtue of the Beeman-Perry-DER jurisdictional line that was negotiated in 1987 and which was established on different criteria and waterward of the 1980 jurisdictional line.[15] While there was some evidence (McDowell testified that Field orally adroit- *510 ted) that the 1985 fill was waterward of the 1980 line, there was no substantial, competent evidence that the 1985 fill was water-ward of the 1987 line. Accordingly, the judgment in favor of the buyers and against the sellers is reversed and the cause remanded only for a determination of costs and attorney’s fees.[16]
REVERSED and REMANDED.
DANIEL, C.J., and HARRIS, J., concur.

. See, e.g., § 403.913(3), Fla.Stat.

. In essence both “misrepresentation” counts were founded on a failure to disclose in accordance with the duty established in Johnson v. Davis, 480 So.2d 625 (Fla.1985).

. Although not the basis for the decision in this case, the breach of contract count was subject to dismissal on the basis of contract law. The contract provided that the buyer would take title subject to governmental regulations provided there exists at closing no violations. A contractual "promise" is a manifested intention that some future performance will be rendered while a "condition” is a fact or an event that operates to affect or limit a legal duty or right. A promise in a contract creates a legal duty in the promisor and a legal right in the promisee that can be enforced by an action for damages for its breach; while the operative fact or event constituting a condition creates no right or duty and is merely a limiting or modifying factor. While a contractual provision can be drawn to be either a promise or a condition, the relevant provision in this case (that no violation of a governmental regulation will exist at closing) is clearly a condition precedent to the buyers’ duty to take the sellers’ title by deed at closing subject to all governmental regulations, restrictions, prohibitions and requirements. Thus, while the fact of a violation of a governmental regulation existing at closing would have operated to have authorized the buyers to have refused to execute the contract by refusing to close without such refusal constituting a breach of their promise to buy, a violation of a governmental regulation existing at closing under the contract does not constitute the breach of a promise by the sellers constituting a cause of action for breach of contract in favor of the buyers. Furthermore, all parties to contracts, particularly land sales agreements, have a duty to determine that all conditions in their favor have occurred before rendering conditional performance or the condition will be deemed to have been waived. See generally, 1 A. Corbin, Corbin on Contracts §§ 627, 633 (1964); 8A G. Thompson, Commentaries on the Modem Law of Real Property § 4458 (1983); Annot., Merger of Contract in Deed, 38 ALR2d 1310 (1954); and Stephan v. Brown, 233 So.2d 140 (Fla. 2d DCA 1970). Compare, Sun First National Bank of Orlando v. Grinned, 416 So.2d 829 (Fla. 5th DCA 1982), rev. denied, 424 So.2d 761 (Fla.1982) with Niesz v. Gehris, 418 So.2d 445 (Fla. 5th DCA 1982), rev. denied, 427 So.2d 736 (Fla.1983). See also Durden v. Century 21 Compass Points, Inc., 541 So.2d 1264 (Fla. 5th DCA 1989); American National Self Storage, Inc. v. Lopez-Aguiar, 521 So.2d 303 (Fla. 3d DCA 1988), rev. denied, 528 So.2d 1182 (Fla.1988); Opler v. Wynne, 402 So.2d 1309 (Fla. 3d DCA 1981), rev. denied, 412 So.2d 472 (Fla.1982).

. See the Federal Water Pollution Control Act Amendments of 1972 and the Clean Water Act of 1977, 33 U.S.C.A. §§ 1251-1376. See generally, Want, Law of Wetlands Regulation, § 2.02 (1989).

. See the Florida Air and Water Pollution Control Act (Chapter 67-436, § 2, Laws of Florida 1967), sections 403.001-403.182, Florida Statutes; particularly section 403.031(2) and (3) defining "pollution” and "waters.” In 1977 the legislature enacted section 403.817 authorizing DER to define by administrative rule a method of determining the "waters of the state” by reference to species of plants and soils but did not repeal section 403.031 which appears to continue to define "waters” for the purposes of the “Florida Air and Water Pollution Control Act.” Peculiarly, in this case DER asserted authority as to wetlands described pursuant to section 403.817, under section 403.161 and not under section 403.913(1).

. The federal list of plants is in 33 C.F.R. § 323.2(a)(3). The state list of plants was originally adopted in 1975 as Florida Administrative Rule 17-4.022 (as amended in 1981, in FAR 17-3.021(16) but replaced now by the expanded list in FAR 17-3.022).

. See 33 U.S.C.A. § 1344(a) and 2 Rodgers, Environmental Law Air and Water, § 4.12 (1986).

. The “Warren S. Henderson Wetlands Protection Act of 1984,” Chapter 84-79, Laws of Florida, (§§ 403.91^403.929, Fla.Stat.).

. See 1800 Atlantic Developers v. DER, 552 So.2d 946 (Fla. 1st DCA 1989).

. The effective date of the Wetlands Protection Act.

. FAR 17-4.022 and its plant list were amended on March 11, 1981, and placed in FAR 17-3.-021(16) as relating to the vegetative index test as it existed prior to October 1, 1984, the effective date of the Wetlands Protection Act.

. See State of Florida, Department of Environmental Regulation v. C.P. Developers, Inc., 512 So.2d 258 (Fla. 1st DCA 1987) which holds that after the effective date (October 1, 1984) of the Wetlands Protection Act, the landowner could not rely on a DER jurisdictional line made before the Wetlands Protection Act when that line had not been grandfathered in accordance with the rule provisions.

. This time period was just recently extended to five years. See Chapter 89-324, Laws of Florida.

. Different wetlands demarcation lines are very apt to be different because the determination based on dominant plant species under FAR 17-3.022 varies with changed physical conditions and is necessarily a matter of opinion based on a large number of subjective factors including interpretation of aerial photographs, or visual inspections; the weighing of evidence as to which of three plant stratum is to be selected; as to the biological identification of plants and as to their classification into species, varieties, or subspecies within a named genus; as to the regularity and elevation of periodic inundation events; as to the area on which water stands or flows more than 30 consecutive days per year; as to hydrology; as to the location of the ordinary or mean high-water line; as to the appropriate engineering techniques; as to water being saline or brackish or flowing mostly from springs; as to methods and agreements to be used to determine the other factors; and most importantly, whether a soil’s assessment indicates a presence or absence of hydric soils.

. While normally the larger number of plant species in the "new" 1984 vegetative index in FAR 17-3.022 as compared with the "old list" (originally in FAR 17-4.022(8), now in FAR 17-3.021(16)) would tend to enlarge the land area of DER jurisdiction and to move it landwards, this is not always the result. In Mansota-88, Inc. v. Wilbur Boyd Corp., 9 Florida Administrative Law Reports (FALR) 644 (1987) an "old list” determination gave DER jurisdiction over 46 acres of a site while a "new list" determination found only 16.5 acres of wetlands jurisdiction. In this case the difference in the 1980 and the 1987 determination may have resulted from the fact that in the 1987 determination the hydric soils assessment apparently limited the dominant vegetative analysis in accordance with section 403.913(3), Florida Statutes.

. See Katz v. Van Der Noord, 546 So.2d 1047 (Fla.1989); Lochrane Engineering, Inc. v. Willingham Realgrowth Investment Fund, Ltd., 563 So.2d 719 (Fla. 5th DCA 1990).